IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

STACEY RUDD, et al.,
     Plaintiff,

vs.                               Case No. 5:11cv373/RS/CJK

DAVID TATUM, et al.,
     Defendants.

_____

## REPORT AND RECOMMENDATION

     This cause is before the court upon plaintiffs' first amended complaints (docs. 24-26), filed pursuant to 42 U.S.C. § 1983. Defendants, Sheriff of Liberty County, Florida Nick Finch, and Sheriff of Calhoun County, Florida Glen Kimbrel, have filed motions for summary judgment (docs. 133, 136), respectively. Plaintiffs have filed responses in opposition to the motions for summary judgment (docs. 144, 145). Defendants subsequently filed motions to strike portions of plaintiffs' responses in opposition (docs. 149, 156); plaintiffs, in turn, submitted responses in opposition to defendants' motions to strike (docs. 157, 159).[1] To clarify the identities of the

_____

[1] The undersigned is inclined to construe defendants' motions to strike as replies to plaintiffs' responses in opposition to the motions for summary judgment. Consequently, plaintiffs' responses in opposition to the motions to strike would then be characterized as sur-replies. After review of the motions to strike and plaintiffs' responses, however, the undersigned's analysis in this Report and Recommendation is unaffected by the issues raised in the respective motions; therefore, discussion of such motions will be limited.

sheriffs, Harrell Wood Revell ("Revell") was the Sheriff for Liberty County and David Tatum ("Tatum") the Sheriff for Calhoun County during the events giving rise to the complaint. Donnie Conyers ("Conyers") succeeded Revell as Sheriff of Liberty County and was then succeeded by the present Sheriff of Liberty County Nick Finch ("Finch"). Sheriff Tatum was succeeded as Sheriff of Calhoun County by Glen Kimbrel ("Kimbrel"). After a careful review of the record and the arguments presented, the undersigned concludes that defendant Finch's motion for summary judgment should be GRANTED, and defendant Kimbrel's motion for summary judgment should be GRANTED in part and DENIED in part.

THE COMPLAINTS AND ALLEGATIONS

Plaintiffs Terri D. Franklin ("Franklin"), Miranda L. Hartzell ("Hartzell"), and Stacey Rudd ("Rudd"), at all times material to these lawsuits, were inmates at the Liberty County Detention Center located in Bristol, Florida. (Docs. 24-26). Plaintiff Hartzell was housed temporarily, on one occasion material to the lawsuit, at the Gadsden Correctional Facility in Quincy, Florida. (Doc. 24, p. 2). Plaintiffs' first amended complaints name three defendants: (1) former Sheriff of Calhoun County Tatum, (2) former Sheriff of Liberty County Conyers, and (3) former Calhoun County Deputy Sheriff William Strawn ("Strawn"). Shortly after the filing of the complaints, current Liberty County Sheriff Finch and current Calhoun County Sheriff Kimbrel were substituted as defendants for Conyers and Tatum, respectively. Kimbrel and Finch are each sued in their official capacities as sheriff and Strawn is sued in his individual and official capacity. The undersigned will refer to former Sheriffs Tatum and Revell throughout this Report and Recommendation, because their conduct is at issue in this case.

At the time of the events giving rise to the complaints, Calhoun County Sheriff's Office lacked a detention facility to house female inmates in the county's custody. In response, Calhoun County Sheriff's Office entered into a verbal agreement with Liberty County Sheriff's Office through which Calhoun County's female inmates would be housed and fed by Liberty County's Sheriff Office for a fee of $39 per day. (Doc. 134-1, p. 2). The Calhoun County Sheriff's Office maintained authority to pick up and transport these female inmates from Liberty County Jail, "as necessary." (Doc. 134-3, pp. 71). Sheriff Tatum appointed Strawn a transport officer for the Calhoun County Sheriff's Department. (Doc. 134-3, p. 72).

*Plaintiff Hartzell*

Plaintiff Hartzell, a female Calhoun County inmate who had been incarcerated in the Liberty County Jail, alleges Strawn had non-consensual, forcible sexual intercourse with her five times. According to Hartzell, in February 2007, Strawn picked her up from the Liberty County Jail for transportation to a dentist appointment. (Doc. 134-10, pp. 10). Instead of going to the dentist appointment, Strawn drove Hartzell to a deserted road and proceeded to have non-consensual forcible sexual intercourse with her while she was still handcuffed. (Docs. 24, p. 5; 134-10, p. 10). The second sexual encounter occurred in March 2007 following Hartzell's transfer to the Holmes County Jail in Bonifay, Florida.[2] (Docs. 134-10, pp. 21-22; 136-10, pp. 1-2). Hartzell had disciplinary problems at Holmes County Jail and was

---

[2] Plaintiff Hartzell's deposition testimony (doc. 134-10), and sworn statement given to Travis Lawson of the Florida Department of Law Enforcement ("FDLE") and Michael Bryant of the Calhoun County's Sheriff's Office (doc. 134-14), appear inconsistent in terms of the order and dates of the sexual encounters. The recapitulation of the evidence in this Report and Recommendation is the undersigned's best effort to reconstruct the actual order of events. For summary judgment purposes, the specific order of the sexual encounters has no determinative effect.

transferred back to Calhoun County. (Doc. 136-10, p. 1). Strawn collected Hartzell and a male inmate at the Holmes County Jail. (Docs. 134-14, p. 6; 136-10, p. 1). Strawn dropped the male inmate off at Calhoun County Jail, but drove Hartzell to the same locale as the February 2007 incident. (Docs. 134-14, p. 6; 136-10, p. 2). Strawn proceeded to have non-consensual, forcible sexual intercourse with Hartzell while she was handcuffed. (Docs. 134-10 p. 21-22; 134-14 p. 6).

On August 6, 2007, Hartzell was transfered to Gadsden Correctional Facility. (Doc. 136-10, p. 3). On November 2, 2007, Strawn picked up Hartzell from the Gadsden Correctional Facility to transport her to a court date for her son. (Docs. 134-10, pp. 44-45; 134-14, p. 8). Strawn again drove Hartzell to an isolated area and had non-consensual intercourse with her. (Doc. 134-14, pp. 8-9). Following the sexual assault, Strawn drove Hartzell to the courthouse for her son's hearing. After the hearing, Strawn drove Hartzell back to the same deserted road. (Doc. 134-14, p. 9). Again Strawn had non-consensual, forced sexual intercourse with a handcuffed Hartzell. (Docs. 136-10, p. 2; 134-14, pp. 9, 25-26). Strawn warned Hartzell not to say anything about the incidents, because "[telling someone] would cause problems for [Hartzell]." (Doc. 134-14, p. 30). Strawn allowed Hartzell to remain at Liberty County Jail for about two weeks following the court appearance so that she could see her husband. (Doc. 134-9, pp. 72-73). On or about November 15, 2007, Strawn picked Hartzell up from Liberty County Jail to take her back to Gadsden Correctional Facility. (Doc. 134-10, p. 45). During this transport, Strawn again had non-consensual, forcible sex with Hartzell, who on this occasion was both handcuffed and shackled. (Docs. 134-10, p. 45; 134-14, p. 31-33). Hartzell reported that the November 15, 2007 incident was the last incident with Strawn. (Doc. 134-10, p. 45).

In her deposition, Hartzell stated that she remembers telling two Liberty County Jail employees–Liberty County Jail Administrator Fannie Partridge ("Partridge") and Correctional Officer Maple Spears ("Spears")–that she was uncomfortable around Strawn and something was going on. (Doc. 134-10, p. 25). This was after the first incident. Hartzell said she told Spears that she was "uncomfortable going anywhere with [Strawn] or being around him." (Doc. 134-10, pp. 15, 26, 52). Admittedly, however, Hartzell could not remember what she specifically told Partridge–"[l]ike I said, when I spoke to Ms. Partridge, I remember telling her something, but I'm not remembering - - I'm not sure what I told her, if it was actually something about him actually putting his hand on me and him having sex with me while I was handcuffed or something like that. I'm not sure." (Doc. 134-10, p. 25). Later in the deposition, Hartzell again expressed her uncertainty regarding what she told Ms. Partridge:

> Q. Is it your testimony here today under oath that you told Ms. Partridge what was going on?
>
> A. Ms. Spears and Ms. Partridge.
>
> Q. I want to know exactly the words you used.
>
> A. I don't remember what I told Ms. Partridge. I know what I told Ms. Spears.
>
> Q. What you have told Ms. Spears is what we have already talked about, that you were uncomfortable with Billy Strawn?
>
> ***
>
> A. Yes, I told Ms. Spears that I was uncomfortable with him and didn't want to go anywhere with him.

(Doc. 134-10, p. 53). Hartzell does remember, however, that after informing Partridge and Spears, they stopped her from riding with Strawn "for a while." (Doc. 146-7, p. 4). Notably, Hartzell does not claim that she informed any other law enforcement authorities of Strawn's conduct prior to being interviewed on October 9, 2008, by the Florida Department of Law Enforcement ("FDLE") and Calhoun County Sheriff's Department. (Doc. 134-10, pp. 23-25).

*Plaintiffs Franklin and Rudd*

On April 5, 2008, Strawn "checked out" plaintiffs Franklin and Rudd, female Calhoun County prisoners, from the Liberty County Jail for cleaning detail at a Relay for Life event at the Liberty County Civic Center. (Docs. 134-4, p. 30; 134-8, p. 53-55). Sheriff Tatum gave Strawn permission to use inmates from the Liberty County Jail for the cleanup. (Doc. 134-4, p. 30). Franklin said that, while driving to the event, Strawn mentioned that if she and Rudd had sex with him he could reduce their sentences or possibly get Franklin out early. (Doc. 134-11, pp. 16-17). Franklin responded by telling Strawn she "wouldn't be able to do something like that unless [she] was drunk." (Doc. 134-11, p. 17). The event and cleanup lasted from 9 p.m. to 11:20 p.m. (Doc. 146-12, p. 2). According to Franklin, Strawn bought pizza and Sparks[3] for the two women. (Doc. 134-11, p. 17). After the event and cleanup, Strawn drove Franklin and Rudd to an area behind the Liberty County high school, near the horse arena. (Doc. 134-8, p. 58). Strawn proceeded to have sex with Rudd and then Franklin. (Docs. 134-8, pp. 59-60; 134-11, pp. 17-18; 134-13, pp. 7-8). Rudd and Franklin were unaware that Strawn intended to have sex with them on the

---

[3] Sparks was a caffeinated alcoholic energy drink, now produced minus the caffeine. *See* http://www.sfgate.com/business/article/Sparks-energy-drink-to-drop-caffeine-3179760.php.

night of April 5, 2008. (Docs. 134-11, p. 14; 134-13, pp. 7-8). Franklin initially expressed hesitation with the idea of having sex with Strawn. (Doc. 134-11, p. 18). In response, Strawn became "agitated" and "angry," hitting his hand on the dashboard of his police cruiser. (Doc. 134-11, p. 18). Strawn told Rudd if she had sex with him he could get her released from jail early. (Doc. 136-6, p. 29). Strawn also threatened Rudd by telling her if she didn't have sex with him he would report her for drinking beer. (Doc. 136-6, p. 29). After arriving back at Liberty County Jail, Franklin says she went to the shower and "cried a little bit." (Doc. 134-11, p. 19). The Relay for Life incident was the only time either of these women had sexual relations with Strawn. (Docs. 134-13, pp. 7-8; 134-11, pp. 13-20).

Rudd spoke with Partridge about Strawn immediately before giving a statement to FDLE on April 29, 2008.[4] (Doc. 134-13, p. 27). Rudd recalls speaking with Partridge "a few times about [Strawn and the sexual encounter]," but could not remember if the conversations took place before, on, or after April 29, 2008. (Doc. 134-13, pp. 28-29). Rudd spoke to Jenny Young ("Young"), a Liberty County Correctional Officer, about the sexual encounter with Strawn between April 5, 2008 and April 29, 2008. (Docs. 134-13, pp. 14-15, 19-20; 134-12, pp. 24-25). Young advised Rudd to file a complaint against Strawn. (Doc. 134-13, p. 15). Rudd never discussed the sexual assault with Sheriff Tatum or any member of the Calhoun County Sheriff's Office prior to Strawn's arrest on April 24, 2008. (Doc. 134-13, p.

---

[4] Strawn was arrested on April 24, 2008, after attempting to solicit sex from Lisa Vaughn, a former Calhoun County female inmate. (Doc. 146-9, p. 46). Following Strawn's arrest, the FDLE and Calhoun County Sheriff's Office opened an investigation into Strawn's behavior and allegations that he engaged in inappropriate sexual contact with female inmates. (Docs. 146-2; 146-13). FDLE interviewed both Rudd and Franklin on April 29, 2008 about the April 5, 2008 incident with Strawn.

8). Rudd admits she never spoke to Liberty County Sheriff Revell about the sexual assault. (Doc. 134-13, p. 26).

Prior to April 24, 2008, Franklin never discussed the sexual assault with Sheriff Revell or any Liberty County Jail correctional staff. (Doc. 134-11, pp. 20, 27). Before April 29, 2008, Franklin did not report Strawn's behavior to Sheriff Tatum or any "representative" of the Calhoun County Sheriff's Office. (Doc. 134-11, p. 22). Franklin was not aware of any facts–other than a previous incident in which Strawn let a woman drive his patrol car–that would lead her to believe that Sheriff Tatum had actual knowledge of Strawn's conduct with female inmates prior to Strawn's arrest. (Doc. 134-11, p. 25).

*Other Incidents Involving Strawn*

On April 24, 2008, Lisa Vaughn ("Vaughn"), a former Calhoun County female inmate, video recorded Strawn attempting to solicit sex from her in return for preferential treatment for her husband who was in jail. (Doc. 146-9, p. 46). That same day, Sheriff Tatum was told by Lisa Vaughn's mother that Strawn had "'raped her daughter.'" (Doc. 136-4, p. 5). Sheriff Tatum, in response, met with Strawn at a local park. (Doc. 136-4, p. 5). Strawn appeared "badly beaten" from the incident with Lisa Vaughn earlier in the day. (Doc. 136-4, p. 5). Strawn was then arrested for bribery and "forc[ing] another to become a prostitute." (Docs. 136-4, p. 6; 146-13, p. 2). On May 2, 2008, Strawn was dismissed from the Calhoun County Sheriff's Office retroactive to April 24, 2008. (Doc. 136-2, p. 1). On December 1, 2008, Strawn pled nolo contendere to two counts of sexual misconduct with an inmate. (Doc. 136-11). The two counts stemmed from the April 5, 2008 horse arena assaults of Rudd and Franklin. (Doc. 136-11, p. 1). The subsequent law enforcement

investigation of Strawn revealed that Strawn had various nude pictures of Liberty County female inmates on his cellular phone. (Doc. 159-5, p. 20). Three Liberty County inmates admitted that they exposed themselves to Strawn, but did not have sexual relations with him. (Doc. 146-2).

Vaughn testified that Strawn did not touch her inappropriately before her release from jail on April 24, 2008. (Doc. 146-9, p. 37). Strawn did, however, make an inappropriate sexual comment to her while she was sitting on her knees, stating, "'[d]on't tell me you ain't been in this position several times.'" (Doc. 146-9, p. 37). Vaughn claims two other Liberty County Jail employees were in the room when Strawn made the comment. (Doc. 146-9, pp. 37-38).

Another inmate, Jennifer Parker ("Parker"), recalled Strawn was "flirty" and would always "conversate [sic]" with the female inmates. (Doc. 146-4, p. 20). Parker, however, did not report Strawn's flirtatious behavior to Jail Administrator Partridge. (Doc. 146-4, pp. 41-42). Parker remembers being in the women's showers when Hartzell entered and told her, "[Strawn] wants to see you naked." (Doc. 146-4, pp. 18, 69). Parker, in response, "peeped" out of the shower and saw Strawn standing in the doorway to the bathroom. (Doc. 146-4, pp. 18, 69-70). Hartzell again asked Parker if she was going to let Strawn see her naked. Parker told her "no, that's gross." (Doc. 146-4, p. 18). In Parker's estimation, Strawn waited in the doorway for about five minutes. (Doc. 146-4, pp. 18, 70).

Strawn helped Dana Fritz ("Fritz"), a Calhoun County inmate housed at Liberty County Jail in 2007, attain trustee status (greater privileges and responsibilities than a normal inmate). (Doc. 146-5, p. 5, 9). In return, Fritz had to do "[w]hatever [Strawn] wanted [her] to do." (Doc. 146-5, p. 5). On one occasion, Strawn took Fritz

into Partridge's office and had Fritz perform oral sex on him. (Doc. 146-5, p. 7). In return, Strawn told Fritz that she would go to rehabilitation instead of jail. (Doc. 146-5, p. 7).

According to Fritz, Strawn sometimes asked to meet with female inmates privately–typically without Partridge present–in Partridge's office. (Docs. 134-6, p. 47; 146-5, p. 6). Partridge allowed various Liberty County officers to meet privately with inmates who were confidential informants in her office. (Doc. 134-6, pp. 46-47). Partridge viewed these meetings as "normal procedure." (Doc. 134-6, pp. 46-47). Strawn may have used Partridge's office to meet privately with female inmates under the guise of confidential informants. (Doc. 134-6, pp. 47-48). Strawn claims he would meet with inmates in Partridge's office for various purposes including informing the inmate of a plea deal or discussing an upcoming court date. (Doc. 134-8, pp. 66-67).

Fritz never informed anyone at the Liberty County Sheriff's Office–including Partridge and Sheriff Revell–of Strawn's behavior. (Doc. 146-5, p. 17). Fritz did, however, speak with Calhoun Sheriff Tatum in December 2007. (Doc. 146-5, p. 19). Fritz told Tatum, "[y]ou need to get your jailer in check because he's making sexual advances against the women." (Doc. 146-5, pp. 20-21). Fritz claims she indicated the jailor was Strawn. (Doc. 146-5, p. 20). Fritz also acknowledges she never told Sheriff Tatum which inmate was the object of Strawn's advances. (Doc. 146-5, p. 21). Fritz discussed Strawn's behavior with Sheriff Tatum only on that one occasion and never discussed Strawn's conduct with any other "investigator." (Doc. 146-5, pp. 21-2). Fritz's friend Ronnie Norris was present during the conversation and

remembers Fritz talking to an officer. Norris also recalls hearing the names "Tatum" and "Mr. Billy" being spoken during the conversation. (Doc. 146-6, pp. 27, 40).

Based upon the foregoing events, plaintiff Rudd filed a civil action in this court (Case No. 5:11cv373/RS/CJK), which was later consolidated with plaintiffs Franklin and Hartzell's cases (Case Nos. 5:11cv374/MP/EMT; 5:11cv351/RS/GRJ). In their first amended complaint, plaintiffs raise one claim against defendant sheriff Finch and former Sheriff Revell–violation of federal constitutional rights. Plaintiffs also raise five claims against defendant Kimbrel and former Sheriff Tatum–(1) violation of federal constitutional rights, (2) negligent hiring, (3) negligent supervision, (4) negligent retention, and (5) battery. Plaintiffs advance the federal constitutional claims under section 1983 and the remaining claims as state law torts. Plaintiffs raise two claims against defendant Strawn–violation of federal constitutional rights and battery. Defendant Strawn has not filed a motion for summary judgment and therefore such claims will not be addressed in the instant Report and Recommendation. Plaintiffs seek compensatory damages, costs, attorneys' fees and other such relief as this court deems just and proper.

## LIBERTY COUNTY SHERIFF FINCH'S MOTION FOR SUMMARY JUDGMENT

Defendant Finch, pursuant to FEDERAL RULE OF CIVIL PROCEDURE 56, moves for summary judgment (doc. 133) against the plaintiffs. Finch asserts that the depositions, affidavits, and discovery responses of record establish that there are no genuine issues of material fact. The motion for summary judgment proceeds under the theory that plaintiffs' claim of deliberate indifference, essential to the section 1983 claim, is unsupported by any evidence of record. (Doc. 133, p. 2). Accordingly,

Finch concludes, he is entitled to summary judgment as a matter of law. (Doc. 133, pp. 1-2).

## RESPONSE TO FINCH'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs respond that Revell's failure to maintain formal policies for the Liberty County Jail and decision to allow Partridge to have complete responsibility for operation of the jail, evidence deliberate indifference on Revell's behalf. (Doc. 144, p. 11). Further, plaintiffs claim Revell made wrongful acts substantially certain to occur by neglecting to implement formal policies, relying on Partridge to run the jail, and failing to be aware of the Prison Rape Elimination Act ("PREA"). (Doc. 144, p. 12). Plaintiffs suggest that Revell had ample notice of the risk that harm would result from failing to have formal policies designed to prevent prison rape. (Doc. 144, p. 13). Plaintiffs conclude that Revell's failure to promulgate policies designed to prevent rape demonstrates direct and supervisory failures on Revell's behalf. (Doc. 144, p. 15).

## ANALYSIS OF FINCH'S SUMMARY JUDGMENT MOTION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). To prevail on a motion for summary judgment, the movant must show that the plaintiff has offered no evidence to support an essential element of his case, or present affirmative evidence that plaintiff will be unable to prove one or more essential elements of the case at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). If the movant successfully negates an essential element of the plaintiff's case, the burden shifts to the plaintiff to come forward with evidence demonstrating a genuine issue of material fact for trial. *See id.*

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *See id.* at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To that end, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004). Likewise, "'unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion'" and "does not create a genuine issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (*quoting Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995)). Rather, the party opposing summary judgment must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, 477 U.S. at 333 n.3 ("Once the moving party has

attacked whatever record evidence–if any–the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."); *Anderson*, 477 U.S. at 250 (providing that the standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict").

The court must examine plaintiffs' first amended complaints (docs. 24-26) to determine whether they have raised a section 1983 claim that will overcome the present motions. Plaintiffs correctly acknowledge that a theory of recovery based upon respondeat superior would be unsuccessful under section 1983. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1331 (11th Cir. 2007) ("[The Eleventh Circuit] do[es] not recognize vicarious liability, including respondeat superior, in § 1983 actions." (*citing Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003))). Instead, plaintiffs argue that defendant Revell is liable under a theory that Revell's actions and policies evidence deliberate indifference towards the plaintiffs' constitutional rights.

Here, defendant Strawn, as far as all evidence of record indicates, operated on his own volition in sexually assaulting these women. Plaintiffs' claims against former Sheriff Revell, therefore, are derived from his supervisory role as Sheriff of Liberty County and the resulting supervisory responsibilities that he had over the Liberty County Jail and the inmates residing therein. "Supervisory liability under § 1983 occurs when the 'supervisor personally participates in the alleged constitutional

violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation.'" *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (*quoting Cottone*, 326 F.3d at 1360). Accordingly, the analysis must assess whether there is a causal connection between Revell's wrongful actions and Strawn's sexual assaults of the plaintiffs.

"A causal connection may be established when: 1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* (*quoting Cottone,* 326 F.3d at 1360). Here, the existence of a causal connection hinges on whether Revell or his jail administrator Partridge,[5] were sufficiently aware of Strawn's unlawful actions towards female inmates at the Liberty County Jail, and failed to act.

Plaintiffs focus the brunt of their argument on Sheriff Revell's customs and policies (or lack thereof) in regards to the operation of Liberty County Jail. Accordingly, the court will first discuss whether plaintiffs are able to establish supervisory liability for deliberate indifference resulting from the establishment (or the failure to establish) of a policy or custom. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or

---

[5] Partridge was former Sheriff Revell's representative as to matters concerning the Liberty County Jail. In that capacity, Partridge had oversight and responsibility for the Liberty County Jail and the inmates therein. The court is not addressing the question of whether Partridge is an appropriate party for section 1983 supervisory liability purposes. For purposes of this summary judgment motion, the court considers Partridge subject to supervisory liability.

obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997); *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (same); *cf. Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness.") (citations omitted).   A policy is defined as "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (*citing Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991)).   "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Goebert*, 510 F.3d at 1332 (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)).   In order to demonstrate a policy or custom, one must show "'a persistent and wide-spread practice.'"   *Id*. (*quoting Depew v. City of St. Mary's Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)).   Establishing "supervisory liability for deliberate indifference based on the implementation of a facially valid constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert*, 510 F.3d at 1332 (*citing West* [*v. Tillman*], 496 F.3d 1321, 1329 (11th Cir. 2007) ("'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" (*quoting Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999))).

Plaintiffs argue that the omission of formal written policies and procedures at the Liberty County Jail and Sheriff Revell's failure to adopt the Florida Model Jail Standards, indicate a policy in and of itself. (Doc. 144, p. 10). The parties have differing accounts of the specific policies that were in place at the time of the sexual assaults in question. (Docs. 133, p. 5; 144, p. 7-8). Liberty County Jail does appear to have recorded the whereabouts of inmates. (Doc.146-12). The existence or absence of certain Liberty County Jail policies, however, does not affect the court's analysis and conclusion. Certainly, given different circumstances and facts, the lack of formal standardized policies could bear on the outcome of a case; here though, the illegality of sexual assault is obvious, and therefore the failure to establish policies prohibiting officers from sexually assaulting inmates does not evidence deliberate indifference. *See Doe ex rel. Doe v. City of Demopolis*, 461 F. App'x 915, 917 (11th Cir. 2012) ("If the impropriety of an action 'is obvious to all without training,' a failure to train a police officer to refrain from taking that action will usually not show deliberate indifference. So a city may 'rely on the common sense of its [police officers] not to engage in . . . criminal conduct . . . .' The City was entitled to rely on Smith's common sense not to commit statutory rape, so its alleged failure not to train him not to commit statutory rape does not show deliberate indifference to the rights of its inhabitants." (citations omitted)); *see also Floyd v. Waiters*, 133 F.3d 786, 796 (11th Cir. 1998), *vacated on other grounds by* 525 U.S. 802 (1998), *reinstated by* 171 F.3d 1264 (11th Cir.1999) (holding that "[w]ithout notice to the contrary, the [Georgia Board of Education] was entitled to rely on the common sense of its employees not to engage in [assault and rape of an underage student]"); *Sewell*, 117 F.3d at 490 (concluding that defendant was not deliberately indifferent because it was

obvious that officer should not barter sexual favors in exchange for letting individuals out of drug arrests). Accordingly, plaintiffs cannot hold Liberty County Sheriff's Office liable for the failure to establish policies that would have forbidden Strawn's criminal conduct. Sheriff Revell was entitled to rely on the obvious knowledge that sexual assault, sexual relations with inmates, and rape, were illegal and as a result Strawn would not commit such acts.[6] Sheriff Revell's adoption of the Florida Model Jail Standards and knowledge, or lack thereof, of the Prison Rape Elimination Act[7] ("PREA") would not overcome the common sense dictates of *Sewell*, *Floyd*, and *Doe ex rel. Doe*.

Nevertheless, the Eleventh Circuit in *Floyd* cautioned that a "pattern of known misconduct . . . may be sufficient to change reasonable reliance into deliberate indifference." 133 F.3d at 796 (citations omitted); *see also Doe ex rel. Doe*, 461 F. App'x at 917 (same). Given that, the court must analyze the record and pleadings to

---

[6] Sexual battery is a crime under Florida law. FLA. STAT. § 794.011. Sexual misconduct between detention facility employees and inmates is also a crime. FLA. STAT. § 951.221.

[7] Plaintiffs further argue that the PREA puts "Florida Sheriffs who operate county jails . . . on constructive and actual notice that sexual abuse is a real problem in incarcerated populations." (Doc. 144, p. 13). Notably, plaintiffs do not cite to a specific case where a congressional finding or study was found sufficient to constitute the notice required to satisfy the deliberate indifference standard of a section 1983 claim. Moreover, plaintiffs do not explain how congressional findings concerning prison rape would put Sheriff Revell on notice that a law enforcement officer in the jail was sexually assaulting inmates. Sheriff Revell, at the time of his deposition on December 4, 2012, admitted that he had never heard of the PREA. (Doc. 134-2, p. 35). Sheriff Revell's lack of knowledge concerning the PREA is not ideal, but no showing has been made he was deliberately indifferent to inmates' well being. *See Farmer*, 511 U.S. at 836 ("[T]he Courts of Appeals have routinely equated deliberate indifference with recklessness.") (citations omitted); *see also Mann v. Hillsborough County Sheriff's Office*, 946 F. Supp. 962, 968-69 (M.D. Fla. 1996) ("Negligent conduct does not constitute the type of abuse of government power that is cognizable under § 1983. Something more akin to deliberate indifference is required. Deliberate indifference implies knowledge, and knowledge constitutes conduct above that of mere negligence.") (citations omitted).

assess whether Sheriff Revell or Partridge were ever on notice of Strawn's criminal behavior. To meet the required element of notice, such behavior, must be widespread or notorious. *See West*, 496 F.3d at 1329 ("'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be *obvious, flagrant, rampant and of continued duration, rather than isolated occurrences*.'" (*quoting Hartley*, 193 F.3d at 1269) (emphasis added)).

Upon review of the record and pleadings, the requisite notice cannot be made out. Plaintiffs do not show the contrary. As an initial and obvious matter, both Sheriff Revell and Partridge deny any personal knowledge of Strawn's behavior prior to April 24, 2008. (Docs. 134-1, pp. 2-3; 134-5, p. 2). Further, Sheriff Revell and Partridge show that before Strawn's arrest on April 24, 2008, the Liberty County Sheriff's Office "never had an employee, correctional officer, or officer of another agency accused of having sexual intercourse, sexual relationships or similar inappropriate relationships with the inmates/detainees housed at the Liberty County Jail." (Docs. 134-1, p. 3; 134-5, pp. 2-3).

Plaintiff Hartzell remembered conveying to Officers Spears and Partridge, after the first sexual assault in February 2007, some sense that she was "uncomfortable going anywhere with [Strawn] or being around him." (Doc. 134-10, pp. 15, 26, 52). Hartzell, however, could not remember what she specifically told Partridge concerning Strawn's behavior. (Doc. 134-10, pp. 25, 53). Hartzell does remember that Spears and Partridge stopped her from riding with Strawn "for a while" following their conversations. (Doc. 146-7, p. 4). Hartzell's vague, and barely remembered, statement to Partridge and Spears that she was "uncomfortable" around Strawn is not sufficient notice that Strawn was committing, or likely to commit, criminal sexual

assaults, for purposes of the civil rights standard of deliberate indifference. Importantly, Hartzell cannot remember whether she indicated Strawn was sexually assaulting her. Partridge's actions, including not having Hartzell ride with Strawn for a time, do not indicate that she was aware of the extreme degree of Strawn's behavior. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (finding within the context of a prison suicide case, "[f]oreseeability, for the purpose of establishing deliberate indifference, requires that the defendant have had 'subjective knowledge of a risk of serious harm,' meaning . . . knowledge of 'a *strong likelihood* rather than a mere possibility that the . . . harm will occur.' (*quoting Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (alterations and emphasis in original))). The court will not blindly guess at what Hartzell–who herself cannot recall–told Partridge, and the court will not impute direct notice. Hartzell acknowledged that she informed no other law enforcement authorities–other than Partridge and Spears–of any issues with Strawn prior to his arrest. (Doc. 134-10, pp. 23-25). Plaintiff Hartzell has not demonstrated that Partridge or Revell were on notice of a pattern of known misconduct.

With regard to plaintiffs Rudd and Franklin, the record again does not indicate the necessary notice required to support liability. Of course, the foregoing analysis is relevant. In addition, Franklin never informed Sheriff Revell or any of the Liberty County Jail correctional staff, prior to April 24, 2008, that she or Rudd had sex with Strawn. (Doc. 134-11, p. 27). Rudd stated that she never spoke to Sheriff Revell about the sexual encounter with Strawn or Strawn's behavior. (Doc. 134-13, p. 26). Rudd did discuss her sexual assault with two Liberty County Sheriff's Office Employees–Partridge and Liberty County Correctional Officer Jenny Young–but

cannot remember whether she spoke to them before April 29, 2008. (Docs. 134-12, pp. 24-25; 134-13, pp. 14-15, 19-20, 28-29). Plaintiff Rudd was only sure she spoke to Partridge on April 29, 2008. (Doc. 134-13, p. 28). In response to her conversation with Rudd, Young directed Rudd to file a complaint against Strawn. (Doc. 134-13, p. 15). Plaintiffs' have not produced evidence from which an instance of notice, before Rudd's conversation with Partridge and Young before, on, or after April 29, 2008, could be drawn.

Plaintiff Rudd also references an instance when Partridge told her to "stand back" so Strawn would not see her and pick her to go with him. (Doc. 134-15, p. 3). Rudd also states that Young told her that Strawn was a "'pig.'" (134-15, p. 3). Rudd does not give any context to the aforementioned comments. Importantly, there is no evidence in the pleadings or record that Rudd told Partridge or Young that Strawn was sexually assaulting inmates.

Plaintiffs also point to various other incidents that occurred around Liberty County Jail. Witness Dana Fritz testified that she gave Strawn oral sex in Partridge's office. Fritz, however, never disclosed to anyone at the Liberty County Sheriff's Office what Strawn was doing to female inmates at the Liberty County Jail. (Doc. 146-5, p. 17). Jennifer Parker recalled that Strawn was flirtatious and would always have conversations with the female inmates. (Doc. 146-4, p. 20). On one instance, Strawn tried to see Parker naked in the Liberty County Jail showers. (Doc. 146-4, pp. 18, 69-70). Strawn also had pictures of naked female inmates on his cellular phone, after his arrest. (Docs. 146-2; 159-5, p. 20). Lisa Vaughn claims that Strawn once told her, while she was sitting on her knees, "'[d]on't tell me you ain't been in this position several times.'" (Doc. 146-9, p. 37)

Additionally, Strawn would often meet with women in Partridge's office for extended periods of time without Partridge present. (Docs. 134-6, p. 47; 146-5, p. 6). Partridge allowed various law enforcement officers to meet with female inmates unsupervised in her office at the Liberty County Jail. (Doc. 134-6, p. 46). Partridge recalls Strawn possibly telling her that he needed to use her office because he was meeting with an inmate who was a confidential informant. (Doc. 134-6, pp. 47-48). Strawn, meanwhile, claims that he would use Partridge's office to discuss plea deals or upcoming court dates with female inmates. (Doc. 134-8, pp. 66-67). Partridge denies that she was aware Strawn was using her office for sex. (Doc. 134-5, p. 2). According to plaintiffs, Strawn, as the Calhoun transportation officer, seemingly had free rein to come and check inmates out at his own discretion. (Doc. 144, p. 6).

For purposes of the § 1983 analysis, the foregoing examples of Strawn's conduct do not demonstrate actual or constructive notice on Sheriff Revell or Partridge's behalf. No evidence shows that any of these instances were reported to Partridge or Revell before April 5, 2008 (the date of Strawn's assaults of Rudd and Franklin). Moreover, plaintiffs do not identify a single example–prior to Rudd speaking with Partridge before, on, or after April 29, 2008–of any person informing Partridge or Sheriff Revell that Strawn was assaulting female inmates at the Liberty County Jail. Strawn's flirtatious behavior, his cell phone pictures, and even his inappropriate sexual comments, without more, would not give rise to the required level of notice, that is, notice of widespread, flagrant and notorious violations. Again, no one, as far as the pleadings and record show, reported any of these instances to Sheriff Revell or Partridge prior to, at the earliest, April 5, 2008. Strawn was arrested on April 24, 2008, and the events at issue in the complaint all occurred on or before

April 5, 2008.  Even Fritz, who claims to have had oral sex with Strawn, never reported that to any jail official.

Sprinkled throughout plaintiffs' pleadings and the record are assertions that Strawn's behavior was "common knowledge" throughout the Liberty County Jail and that Partridge and Revell must have known about Strawn's conduct.  Claims of such general common knowledge, are not based on personal knowledge, and are not appropriate for consideration in a summary judgment motion.  *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion."); *Cordoba v. Dillards*, 419 F.3d 1169, 1181 (11th Cir. 2005) (holding that "'unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion'" (*quoting Hedberg*, 47 F.3d at 931-32)); *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("The Rules are clear: 'Supporting and opposing affidavits shall be made on personal knowledge.'  Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief'–instead of only knowledge–from raising genuine issues of fact sufficient to defeat summary judgment.  Likewise, an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." (internal citations omitted)); *Stewart v. Booker T. Washington Ins.*, 232

F.3d 844, 851 (11th Cir. 2000) (finding that plaintiff's conclusory allegation based "upon information and belief" does not indicate personal knowledge and thus cannot carry plaintiff's burden on summary judgment); *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."). The "common knowledge" argument also suffers from a logical flaw–if so many people knew about the problem, one would think that witnesses could be found.[8]

Plaintiffs have not shown that Sheriff Revell or Partridge had the requisite notice that Strawn was sexually assaulting female inmates. Plaintiffs have not demonstrated a "pattern of known misconduct" sufficient to "change reasonable reliance into deliberate indifference." *Floyd*, 133 F.3d at 796. Similarly, plaintiffs have not shown that Strawn's actions were so "obvious, flagrant, rampant and of continued duration" as to constitute widespread abuse sufficient to notify Revell or Partridge. *See Hartley*, 193 F.3d at 1269. The facts show that Strawn sexually assaulted Hartzell away from the jail and under the guise of transporting her to various appointments or court appearances. Likewise, Rudd and Franklin were checked out under the facade of cleaning up after a charity event. Fritz performed oral sex on Strawn in Partridge's office, but admittedly did not disclose the incident to Liberty County Jail employees. Plaintiffs have not put forward evidence to demonstrate actual or constructive notice such as could be imputed to Sheriff Revell

---

[8] Importantly, the common knowledge plaintiffs claim here is not at all like the sort of common knowledge that can be empirically determined. *See Horrillo v. Cook, Inc.*, No. 10-15327, 2012 WL 6553611, at *1 (11th Cir. Nov. 7, 2012) ("Depositions in this case suggest that it was common knowledge that biliary stents, like Cook's, were frequently used "off-label" to facilitate peripheral circulation, including in the renal arteries.").

or Partridge. *See Doe ex rel. Doe*, 461 F. App'x 917-18 (holding that police chief's testimony that he had heard rumors of officers "'engaging in sexually inappropriate conduct . . . [but] not necessarily [with] underaged people'" and police chief's prior statement to officers that he had "heard guys [were] messing with underaged girls," and the officers should "'stop it,'" does not demonstrate that the "[c]ity actually was aware . . . its officers [were] committing statutory rape . . . ." (alterations in original)); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (finding that, despite past complaints against a police officer, there was no evidence indicating the city had notice of past police misconduct because "[plaintiff] never demonstrated that past complaints of police misconduct had any merit . . . . [T]he number of complaints bears no relation to their validity.").

To the extent plaintiffs' attempt to frame their cause of action as a failure to supervise or train under section 1983, such an effort is doomed by the previous conclusions. *See Sewell*, 117 F.3d at 490 ("Where the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." (*quoting Walker*, 974 F.2d at 299-300) (alterations in original)). Clearly, the wrongful nature of sexual assault of inmates is obvious to all without training; furthermore, abuse of inmates is not a "likely" consequence of failing to train officers not to commit unlawful sex crimes.

On the broad issue of supervisory liability, plaintiffs have not demonstrated any of the causal connections needed to establish such liability. *See Mathews*, 480 F.3d at 1270 (listing the causal connections required for supervisory liability under section

1983). Plaintiffs' have not shown a "history of widespread abuse" so as to put Partridge or Revell on notice of the need to correct such abuse, nor have they put forward sufficient facts to support an inference that Revell or Partridge knew Strawn was acting unlawfully and failed to stop him from doing so. Revell and Partridge, moreover, cannot be liable for a policy, or lack thereof, regarding Strawn's illegal conduct. In short, Sheriff Revell, and therefore his successor in this suit Sheriff Finch, did not engage in acts of deliberate indifference of constitutional magnitude.

Having determined that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, the undersigned recommends that summary judgment be granted in Finch's favor as to all of plaintiff's claims (count II). *See* Fed. R. Civ. P. 56(c)(2), 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."); *Celotex Corp.*, 477 U.S. at 324 ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

## CALHOUN COUNTY SHERIFF KIMBREL'S MOTION FOR SUMMARY JUDGMENT

Defendant Kimbrel has also filed a motion for summary judgment and supporting memorandum (doc. 136). Kimbrel asserts that no genuine dispute exists as to any material fact regarding the claims asserted against him. Accordingly,

Kimbrel urges, he is entitled to summary judgment as a matter of law on all claims. (Doc. 136, p. 1)

Kimbrel's motion proceeds from the premise that plaintiffs have not demonstrated that his predecessor as Calhoun County Sheriff, Tatum, was deliberately indifferent for purposes of section 1983. (Doc. 136, p. 2). Additionally, defendant Kimbrel argues that, under Florida law, either the agency or the individual can be liable for intentional and negligent torts, not both. (Doc. 133, p. 2). Alternatively, Kimbrel states that Tatum is not liable under the alternative theories of negligent hiring, retention or supervision, because a "police agency cannot be liable for a rape committed by one of its law enforcement officers." (Doc. 136, pp. 2-3). As for plaintiffs' claim of battery, defendant Kimbrel contends that Tatum is insulated from liability because Strawn was not acting or motivated, even in part, to serve his employer. (Doc. 136, p. 3). Finally, defendant Kimbrel posits that any state law claims asserting that policies or resource allocation contributed to or caused plaintiffs' injuries are barred because such decisions are discretionary planning level decisions. (Doc. 136, p. 3).

## PLAINTIFFS' RESPONSE TO KIMBREL'S SUMMARY JUDGMENT MOTION

Plaintiffs urge they can meet the standard of deliberate indifference. (Doc. 145, p. 1). Plaintiffs say that Sheriff Tatum lacked formal policies concerning the female inmates housed at Liberty County Jail, had ample notice of Strawn's illegal behavior, and had direct and supervisory failures of Strawn's conduct, all of which together make Sheriff Tatum deliberately indifferent under section 1983. (Doc. 145, pp. 11-19). Under Florida law, plaintiffs argue Sheriff Tatum was negligent in hiring,

supervising and retaining Strawn. (Doc. 145, pp. 19-20). Finally, plaintiffs attempt to rebut defendant Kimbrel's scope of employment argument concerning battery by analogizing sexual assault to a "theft" and "search." (Doc. 145, p. 21).

ANALYSIS OF KIMBREL'S MOTION FOR SUMMARY JUDGMENT

*Count I - Violation of Federal Constitutional Rights*

The undersigned will first address whether defendant Kimbrel can be liable under section 1983.[9] As with defendant Finch (and his predecessor Revell), plaintiffs argue that defendant Kimbrel is liable because his predecessor, Sheriff Tatum, had such loose policies concerning transportation of Calhoun County inmates housed at Liberty County, that in effect, there was no policy. (Doc. 145, p. 12). While not explicitly argued, plaintiffs seemingly claim that the lack of policies allowed Strawn unfettered access to check out female inmates and rape them. As explained before, lack of an explicit policy prohibiting rape of inmates does not equal deliberate indifference. *See Doe ex rel. Doe*, 461 F. App'x at 917 ("[A] city may 'rely on the common sense of its [police officers] not to engage in . . . criminal conduct . . . .' The City['s] . . . alleged failure not to train him not to commit statutory rape does not show deliberate indifference to the rights of its inhabitants." (alterations in original) (citations omitted)).

Plaintiffs further claim that Sheriff Tatum "fail[ed] to investigate, supervise, or discipline Strawn" and such failures are "sufficient to constitute liability." (Doc. 145, p. 13). Recognizing the applicable law, plaintiffs admit that Sheriff Tatum must

---

[9] Much of the applicable and relevant law that will be cited in this section has been discussed previously in the discussion of defendant Finch's motion for summary judgment. *See supra* pp. 15-19.

be on notice of a need to train and/or supervise in a particular area. (Doc. 145, p. 13). Again, liability will not lie under these theories. *See Sewell*, 117 F.3d at 490 ("Where the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." (*quoting Walker*, 974 F.2d at 299-300) (alterations in original)). As for a failure to discipline, Tatum could only be liable for such a failure if he were aware, under section 1983's notice standards, that Strawn was abusing female inmates and failed to discipline him for it. Accordingly, the undersigned must analyze the records and pleadings to determine whether Strawn's conduct evidenced a "pattern of known misconduct . . . [which] may be sufficient to change reasonable reliance into deliberate indifference." *Floyd*, 133 F.3d at 796 (citations omitted).

As a preliminary matter, plaintiffs again argue that Sheriff Tatum should have been on constructive or actual notice because of studies issued by the Human Rights Watch, United States Government Accountability Office, Amnesty International, United Nations Fact-Finders, and Congress, all of which addressed the sexual abuse of inmates in prisons. (Doc. 145, pp. 16-17). Notably, plaintiffs do not put forward any cases supporting this line of reasoning, or suggesting that the mere existence of such studies suffices for notice under section 1983. Instead, plaintiffs' argument misconstrues the notice and causal connection components of supervisory liability under section 1983. *See Connick*, 131 S. Ct. at 1360 (deliberate indifference "require[s] proof that a municipal actor disregarded a known or obvious consequence of his action."); *see also West*, 496 F.3d at 1329 ("'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious,

flagrant, rampant and of continued duration, rather than isolated occurrences.'" (*quoting Hartley*, 193 F.3d at 1269)). If the court were to allow studies and findings alone to impute sufficient notice to a supervisor or the county under section 1983, supervisors could be liable for subordinates' actions they were not aware of and did not, either explicitly or implicitly, condone or facilitate. Such a standard does not comport with section 1983's focus upon intentional acts.

Former Calhoun Sheriff Tatum, while Strawn's employer, had no responsibility for the operation of the Liberty County Jail. Neither Rudd, Franklin, or Hartzell ever informed Sheriff Tatum of Strawn's conduct. Strawn's personnel file and related investigation files of the Calhoun County Sheriff's Office showed no complaints (prior to April 24, 2008) involving "allegations of him seeking sexual favors from either arrestees or inmates." (Doc. 136-4, pp. 2-3).

Plaintiff points out that in 2004, Strawn allowed two females he had met at a local restaurant to drive his patrol car and activate the lights and sirens. (Doc. 145, p. 8). In response to the incident the sheriff initiated discipline–Strawn was put on twelve months probation, had to forfeit his vacation time in the amount of 120 hours, lost his take home car for six months, was transferred to the Calhoun County Court House security detail, and was placed on a seven day unpaid suspension. (Doc. 136-3, p. 2). Strawn was also demoted from Sergeant. (Doc. 146-10, p. 37). Although officer Sonny Coburn says he heard rumors that Strawn let one of the women drive because he was trying to have a relationship with her, the source of such rumors does not appear in the record. (Doc. 146-11, p. 8). Moreover, Sheriff Tatum had no knowledge of any such rumors. (Doc. 134-4, pp. 155-56).

Plaintiffs also note that witness Dana Fritz spoke to Sheriff Tatum in December 2007, telling him, "[y]ou need to get your jailer in check because he's making sexual advances against the women." (Doc. 146-5, pp. 20-21). Fritz claims that she indicated the jailor she was referring to was Strawn. (Doc. 146-5, p. 20). Fritz did not identify the objects of Strawn's misbehavior, nor provide any details of the advances. (Doc. 146-5, p. 21). Fritz says this was her only conversation with Sheriff Tatum concerning Strawn, that she never followed up on her initial complaint, and that she never discussed Strawn's conduct with any other "investigator." (Doc. 146-5, pp. 21-22). Ronnie Norris, Fritz's friend, remembers that Fritz talked to an officer and also recalls hearing the names Tatum and Mr. Billy being spoken during the conversation. (Doc. 146-6, pp. 27, 40).

Strawn's actions with the police cruiser in 2004 do not rise to the level of informing Sheriff Tatum that Strawn would sexually assault female inmates years later. The fact that Strawn allowed two women to drive his police car simply does not provide notice he would later commit multiple sexual assaults against female inmates under his control. Nor does such an incident indicate that Strawn had aggressive sexual tendencies. The incident was, to be sure, misconduct, for which Strawn was disciplined in a significant manner.

Further, the incident between Fritz and Sheriff Tatum will not support liability under section 1983. In *Floyd*, the Eleventh Circuit cautioned that a "pattern of known misconduct" could result in deliberate indifference on the part of a supervisor. 133 F.3d at 796. The testimony of the parties and record indicate that this was the only instance that Sheriff Tatum was informed of Strawn's misbehavior. The information provided was vague, Fritz did not indicate that Strawn was raping (or even touching)

inmates, or committing any crimes at all.  Fritz only indicated to Sheriff Tatum that Strawn was making sexual advances towards inmates.  The phrase "sexual advances" does not convey that Strawn was committing illegal acts and certainly does not indicate that Strawn was sexually assaulting inmates. The absence of deliberate indifference is also supported by the nonexistence of any complaint from the women who would have best known the details–the inmates themselves.

Plaintiffs have not shown Sheriff Tatum to be aware of Strawn's sexual assaults of inmates or that "a history of widespread abuse" put Sheriff Tatum on notice of the need to correct such abuse.  Accordingly, plaintiffs have not demonstrated the requisites to establish supervisory liability.  Plaintiffs' federal claims against Sheriff Tatum and his successor Sheriff Kimbrel should be dismissed.

*Count IV - Negligent Hiring*

Plaintiffs assert a claim under Florida law against Sheriff Tatum for negligent hiring.  Strawn was hired by the Calhoun County Sheriff's Office effective October 8, 2001. (Doc. 136-4, p. 1).  Sheriff Tatum personally performed a background check on Strawn in 1996 and received only positive comments about his performance. (Doc. 136-4, pp. 1-2).  Prior to hiring Strawn in October 2001, Sheriff Tatum had his former Undersheriff Roman Wood and Executive Assistant Robin Clemons perform a second background check on Strawn.  (Docs. 136-4, p. 2; 136-9).  Strawn's second background check also came back clean. (Doc. 136-9).  During Undersheriff Wood's typical background investigation, he would consult with the prospective employee's former employer concerning any complaints against the employee.  (Doc. 136-4, p. 2).  Sheriff Tatum never received any indication of complaints against Strawn prior to hiring him.  (Doc. 136-4, p. 2).  Sheriff Tatum also had no indication of any

criminal charges pending against Strawn or convictions on his record. (Doc. 136-4, p. 2). Finally, Sheriff Tatum had not personally heard any rumors or verbal complaints about Strawn's peformance as a patrolman for the Blountstown Police Department (Strawn's former employer). (Doc. 136-4, p. 2).

"Negligent hiring occurs when, prior to the time the employee is actually hired, the employer knew or should have known of the employee's unfitness . . . . [A] primary focus is whether the employer conducted an adequate pre-employment investigation into the prospective employee's background." *Magill v. Bartlett Towing, Inc.*, 35 So. 3d 1017, 1020 (Fla. 5th DCA 2010). Here, Sheriff Tatum clearly conducted an adequate pre-employment investigation process into Strawn's background. Strawn had been subject to two background checks in a five year span and neither divulged anything of significance. Moreover, plaintiffs do not allege any instance of conduct prior to Strawn's hiring in 2001 that would have indicated Strawn was unfit for employment. Sheriff Tatum, therefore, is not liable for negligent hiring.

Perhaps recognizing the futility of a negligent hiring argument, plaintiffs argue that in 2004 Sheriff Tatum was reelected sheriff and as a result reappointed his officers, thus, in effect, rehiring them. Plaintiffs argument is a distinction without a difference. Surely plaintiffs are not advocating that Sheriff Tatum be forced, every time he was reelected as sheriff, to conduct additional background checks on his previously cleared employees. Sheriff Tatum was not hiring new employees who he would have to evaluate and was unfamiliar with, he was continuing with employees who had already undergone background checks and had been found fit to hire. Sheriff Tatum's reelection does not give rise to a duty to conduct additional background checks on already serving employees. Moreover, plaintiffs do not

suggest what such checks would have revealed, in addition to matters already known to the sheriff.

As discussed herein, Sheriff Tatum could not have reasonably foreseen, based on the 2004 incident involving a cruiser, that Strawn would later sexually assault inmates at the Liberty County Jail. *See Malicki v. Doe*, 814 So. 2d 347, 363 (Fla. 2002) ("An employer is found liable for negligent hiring if, at the time of hiring, the employer had reason to believe that hiring this person would create an undue risk of harm to others. Hence, the court does not inquire into the employer's broad reasons for choosing this particular employee for the position, but instead looks to whether the specific danger which ultimately manifested itself could have reasonably been foreseen at the time of hiring.") (citations omitted). Sheriff Tatum could not have known, even after Strawn's 2004 incident, that Strawn would sexually assault inmates. Because Sheriff Tatum conducted an adequate pre-employment screening prior to hiring Strawn, Sheriff Tatum cannot be liable for negligent hiring. The motion should be granted as to this claim, count IV of the complaint.

*Counts V and VI - Negligent Supervision and Retention*

As an initial matter, negligent retention and supervision are duplicative claims. *See Albra v. City of Ft. Lauderdale*, 232 F. App'x 885, 888 (11th Cir. 2007) ("To state a cause of action for negligent supervision or negligent retention under Florida law the claimant must allege: (1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach." (*citing Roberson v. Duval Cnty. School Bd.*, 618 So. 2d 360, 362 (Fla. 1st DCA 1993); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (equating negligent supervision and negligent retention claims); *Blue*

*v. Miami-Dade County*, 10-23599-CIV, 2011 WL 2447699, at *4 (S.D. Fla. June 15, 2011) (treating claims of negligent supervision and negligent retention as equal causes of action). Hence, counts V and VI should be analyzed as a singular negligence claim.

"Negligent supervision[10] occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005) (*citing Garcia v. Duffy*, 492 So. 2d 435, 438-39 (Fla. 2d DCA 1986)). An employer's failure to take further actions, however, must be unreasonable. *See, e.g., id.* ("[P]laintiff must allege facts sufficient to show that once an employer received actual or constructive notice of problems with an employee's fitness, it was unreasonable for the employer not to investigate or take corrective action.") (citations omitted). Additionally, "[t]here must be a connection and foreseeability between the employee's employment history and the current tort committed by the employee." *Id.* at 661 ("[T]he breach of [the] duty [owed to plaintiff] must be the proximate cause of the plaintiff's harm.") (citations omitted).

---

[10] Plaintiffs, in their response to defendant Kimbrel's motion for summary judgment, argue that Sheriff Tatum is liable for negligent supervision because he was seemingly unaware of Florida's "Sexual Misconduct" statute and therefore may not have trained or supervised his deputies consistent with that statute. (Doc. 145, pp. 19-20). Plaintiffs only reference a portion of Tatum's deposition in which he stated he did not believe there was a "Sexual Misconduct" statute. (Doc. 145, pp. 19-20). Plaintiffs put forward no additional evidence indicating he did not train or inform his officers that sexual contact with inmates was a third degree felony, or that his officers were not aware it was a crime to have sexual relations with inmates. Further, the court cannot discern, without more, how Sheriff Tatum's potential unawareness of Florida's "Sexual Misconduct" statute has any effect on a negligent retention or supervision claim. Regardless, even if Sheriff Tatum was unaware of the statute, his ignorance would not bear upon a negligent supervision or retention claim.

Florida courts have further cautioned that recovery for "a loss or injury which is not a direct result of the negligent act" will be prohibited "if the injury was only 'possible'[11] as opposed to "probable.'" *Spann v. State, Dept. of Corr.*, 421 So. 2d 1090, 1092-93 (Fla. 4th DCA 1982) (*quoting Guice v. Enfinger*, 389 So. 2d 270, 272 (Fla. 1st DCA 1980)); *but see Jackson v. Milner*, 654 So. 2d 1045, 1046 (Fla. 1st DCA 1995) (holding that "where reasonable persons could differ as to whether the facts establish proximate causation–i.e., whether the specific injury was genuinely foreseeable or merely an improbable freak–then the resolution of the issue must be left to the fact-finder.") (citations omitted).

Here, Strawn's behavior in 2004–allowing two female non-inmates to drive his patrol car–does not give rise to a probable likelihood that he would sexually assault female inmates years later. Sheriff Tatum could not have foreseen, based only on that isolated incident, that Strawn would later sexually assault female inmates. Moreover, once Strawn's behavior in 2004 came to light, Sheriff Tatum disciplined Strawn, demoted him, and then reassigned him. Sheriff Tatum, therefore, cannot be liable for negligent retention or supervision until, at the earliest, December 2007, when Dana Fritz informed Sheriff Tatum he "need[ed] to get [his] jailer in check because he's making sexual advances against the women." (Doc. 146-5, pp. 20-21). Plaintiff Hartzell, consequently, cannot state a claim for negligent supervision or retention because Strawn last sexually assaulted her on November 15, 2007, at least fifteen

---

[11] Possible has been defined as "those which happen so infrequently from the commission of a particular act, that in the field of human experience they are not expected as likely to happen again from the commission of the same act." *Spann*, 421 So. 2d. at 1092-93 (*quoting Cone v. Inter-County Telephone & Telegraph Co.*, 40 So. 2d 148, 149 (Fla. 1949)).

days prior to Sheriff Tatum being put on notice of Strawn's behavior. (Doc. 134-10, p. 45).

Plaintiffs Rudd and Franklin's claims require further discussion. Fritz's statement was isolated, vague, did not mention any illegal activity, and did not indicate who the supposed victims were. Sheriff Tatum had not received any other complaints concerning Strawn's inappropriate behavior–including from the female inmates Strawn was supposedly making sexual advances towards. Tatum's lack of investigation following Fritz's statement, given the circumstances and lack of supporting evidence, could be reasonable. Sheriff Tatum does not have an obligation to investigate every seemingly unsupported claim made by inmates or former inmates.

Nevertheless, sexual relations between jail personnel and inmates is a crime under Florida law. The context of Fritz's statement, and her reference to "your jailer," suggest she was providing information to the sheriff concerning wrongful acts being performed by someone in the sheriff's employee, and in a position that might facilitate such wrongful acts. Sheriff Tatum had knowledge of an accusation that a specific officer was committing, or attempting to commit, a crime. The accusation also suggested a present danger to those under the sheriff's charge. Sheriff Tatum's alleged failure to investigate or follow up on Fritz's statement–given Fritz's specific reference to the jailer, Strawn's prior disciplinary record, and the seriousness of the allegation–could be viewed as unreasonable. Indeed, the potential gravity of the Fritz warning cannot be ignored. As such, the conflicting inferences from the evidence are best left for a jury. *See Anderson*, 477 U.S. at 252 (noting that for a plaintiff to survive a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff;" courts must therefore inquire into "whether

reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict–'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (*quoting Schuylkill and Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871))).

Of obvious import here, in a light most favorable to plaintiffs Rudd and Franklin, the undersigned notes that Sheriff Tatum took no action in response the Fritz accusation. Accordingly, the adequacy or inadequacy of any corrective measures is not before the court. Stated otherwise, these plaintiffs have made a showing to indicate that a duty, at least to investigate, arose. Questions of breach of duty and causation are premature.

Accordingly, the undersigned recommends that summary judgement as to claims V and VI be dismissed as to plaintiff Hartzell and denied (with the counts merged into a single claim) as to plaintiffs Rudd and Franklin.[12]

## Count VII - Battery

Plaintiffs' also argue that Strawn and Sheriff Tatum are liable for battery. Sexual battery is a crime under Florida Law. FLA. STAT. § 794.011. The Florida

---

[12] As the analysis here reveals, the Fritz evidence does not aid plaintiffs as to the civil rights claim, but does provide an important element of their negligence claim. The court reviews state law tort claims under a negligence standard and section 1983 claims of deliberate indifference under a standard greater than negligence. *See Farmer*, 511 U.S. at 836 ("[T]he Courts of Appeals have routinely equated deliberate indifference with recklessness.") (citations omitted); *see also Mann v. Hillsborough County Sheriff's Office*, 946 F. Supp. 962, 968-69 (M.D. Fla. 1996) ("Negligent conduct does not constitute the type of abuse of government power that is cognizable under § 1983. Something more akin to deliberate indifference is required. Deliberate indifference implies knowledge, and knowledge constitutes conduct above that of mere negligence.") (citations omitted).

Third District Court of Appeal summarized the applicable law concerning an employer's liability for criminal acts:

> Under the doctrine of respondeat superior, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. An employee's conduct is within the scope of his employment, where (1) the conduct is of the kind he was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master. "Generally, sexual assaults and batteries by employees are held to be outside the scope of an employee's employment, and therefore, insufficient to impose vicarious liability on the employer."

*Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356-57 (Fla. 3d DCA 2001) (citations omitted). "The purpose of the employee's act, rather than the method of performance thereof, is said to be the important consideration." *Hennagan v. Dep't of Highway Safety & Motor Vehicles*, 467 So. 2d 748, 751 (Fla. 1st DCA 1985) (citations omitted).

Here, while Strawn's actions did occur within the time and space limits of his employment, he was not hired to sexually assault or batter inmates. The record and pleadings are devoid of any evidence indicating that Strawn committed his crimes in an effort, even in part, to serve Sheriff Tatum or the Calhoun County Sheriff's Office. Plaintiffs' also argue that Strawn's actions could be characterized as a "theft" and the sexual abuse of inmates as a "search." (Doc. 145, p. 21). Alternatively, plaintiffs' posit that Strawn's sexual assault of inmates was possibly a way to assert control over them. (Doc. 145, p. 21). Neither argument is borne out by the record or supported

by citation to applicable law. Because Strawn committed criminal acts solely for his own benefit, Sheriff Tatum and the Calhoun County Sheriff's Office cannot be liable for those acts. *See City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 202 (5th Cir. 1965) (officer's assault and rape of plaintiff were outside of his employment as a police officer). To the extent that Sheriff Tatum can be liable for these acts, such liability would spring exclusively from the claim for negligent supervision, and not from a separate cause of action. Accordingly, the undersigned recommends claim VII be dismissed.

Having determined that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, the undersigned recommends that summary judgment be granted in Sheriff Kimbrel's favor as to the totality of plaintiff Hartzell's claims (counts I, IV, V, VI, and VII). Summary judgment should be granted in part in Sheriff Kimbrel's favor as to plaintiffs Rudd and Franklin's claims (counts I, IV, and VII); but, plaintiff Rudd and Franklin's remaining claims, counts V and VI, should continue and be merged into a singular claim against defendant Kimbrel. The claims of Rudd, Franklin, and Hartzell as to defendant Strawn, violation of federal constitutional rights(count III) and battery by (count VII), will remain.

Accordingly, it is respectfully RECOMMENDED:

1. That defendant Finch's motion for summary judgment (doc. 133) be GRANTED, and, consistent with this, that final judgment be entered in favor of defendant Finch as to all claims.

2.    That defendant Kimbrel's motion for summary judgment (doc. 136) be GRANTED as to all claims by plaintiff Hartzell, and, consistent with this, that final judgement be entered in favor of Kimbrel as to the claims brought by Hartzell.

3.    That defendant Kimbrel's motion for summary judgment (doc. 136) be GRANTED as to plaintiff Rudd and Franklin's counts I, IV, and VII, and DENIED as to counts V and VI.

4.    That plaintiffs Rudd and Franklin's remaining claims against defendant Kimbrel, V and VI, be merged into a singular negligence claim.

At Pensacola, Florida this 31st day of May, 2013.

/s/ *Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).